Opinion by Judge SACK; Concurrence by Judge M. SMITH.
OPINION
SACK, Senior Circuit Judge:
The petitioner-appellant, Stacey Daniella Dyer, appeals from the judgment entered on December 15, 2009, in United States District Court for the Eastern District of California (Oliver W. Wanger, Judge) denying her 28 U.S.C. § 2254 petition for a writ of habeas corpus. Dyer contends that the California Court of Appeal unreasonably applied clearly established Supreme Court precedent when it affirmed the trial court’s decision to admit as evidence statements made by Dyer during a station-house interview. She maintains that the interview was a custodial interrogation under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and its progeny, and that because detectives failed to deliver the Miranda warnings required in such circumstances, her statements should have been excluded. Because we conclude that fairminded jurists could disagree as to whether Dyer was “in custody” when she made the statements in dispute, we affirm the district court’s denial of Dyer’s application for habeas relief.
BACKGROUND[1]
On May 19, 2004, a California state jury returned a guilty verdict against Dyer on charges of first degree felony murder, second degree robbery, and kidnaping in connection with the death of 19-year-old D.J. Hunter. The evidence adduced at trial tended to link Dyer and several other alleged participants to a chain of events in the early morning of March 22, 2002, which culminated in Hunter’s killing.
*1136 Hunter’s body was found at approximately 6:00 a.m. He had been shot three times in the head and placed in the bed of his own pickup truck, which had been set on fire. A local business owner found Hunter’s cellular telephone nearby, and officers retrieved it later that day. Telephone records revealed a call to Dyer’s apartment, which prompted the police to obtain a search warrant for her home in Fowler, California. Officers began executing the warrant at about 10:35 p.m. on March 28, 2002. Dyer was not home at that time, but she arrived five minutes later. The police officers locked her in the rear of a patrol car while they completed their search.
The events of the next six hours, adopted as the factual findings underlying the Court of Appeal’s decision, were as follows:
[Detective] Chapman arrived at Dyer’s apartment after the warrant had been executed. When he arrived, he found Dyer seated in the back seat of Deputy Simpso[n]’s patrol car, which was parked in the alley outside of Dyer’s apartment. The doors to the patrol car were closed and Dyer could not open them from the inside of the back seat. Chapman could not recall if the car was unattended at the time he arrived. Chapman contacted Dyer and told her he was conducting an investigation. Neither Chapman nor his partner, Detective Rasmussen, was in uniform. They did not display a firearm to Dyer. Chapman asked her if she would mind coming to the sheriffs Division to speak to “us.” She was agreeable. Dyer was transported to the Division and her interview began approximately 30 minutes later. She was in the patrol car for over an hour, at the apartment and in transit from her apartment in Fowler.
Dyer was never handcuffed nor was she told she was under arrest. At the outset of the interview, Dyer was told she was not in custody and she was free to leave. The interview room was approximately 15 feet by 15 feet. It contained chairs, a table, and a trash can. Dyer was not under the influence of drugs at the time of the interview. The interview lasted 3 hours and 45 minutes. Two breaks were taken during the interview, one at 1:54 a.m. and one at 3:01 a.m. During the first break Dyer got up, left the room, walked to the restroom (approximately 30 yards away), used the restroom, and returned to the interview room. At each break, Dyer said that no promises or threats had been made to her. For the first hour and a half of the interview, Dyer denied all knowledge and involvement. She later admitted that she had some contact with D.J. on the evening of the 21st. Dyer said she wanted to go home. She was arrested. During their interview of Dyer, the officers told her that they knew “pretty much” where she was and what she was doing. They told her that people had told them that she was the one that killed D.J.
Lopez, 2007 WL 738787, at *9-10, 2007 Cal.App. Unpub. LEXIS 1978, at *25-27.
Chapman also testified that although Dyer could have left the police station during either of the two breaks, by that time he believed he had probable cause to arrest her, and indeed would have had she attempted to leave. Testimony of Detective Mark Chapman, Transcript of Miranda Hearing, March 19, 2004, Petitioner’s Excerpts of Record (“E.R.”), vol. I, ex. 3, at 1776-77.
Before trial, Dyer moved to suppress her statements to the police. Based largely upon what the trial court saw as Dyer’s apparent willingness to accompany the detectives to the station, and upon the detectives’ indication at the beginning of the interview that she was neither under ar *1137 rest nor in trouble, the trial court denied the motion. Trial Court Ruling on Miranda Issue, March 25, 2004, E.R. vol. I, ex. 4, at 3001-05. At trial, the prosecution introduced lengthy excerpts of Dyer’s interview. The prosecution argued that her statements tended to place her with Hunter on the morning of the murder, and that her tone of voice suggested evasion and lack of remorse. Closing Statement of Dennis Peterson, Deputy District Attorney, Trial Tr., May 17, 2004, E.R. vol. I, ex. 5, at 9287, 9290-92.
The jury found Dyer guilty of first degree felony murder, second degree robbery, and kidnaping, and the court sentenced her on June 17, 2004, to life imprisonment without the possibility of parole. On March 12, 2007, her direct appeal was denied on the merits by the California Court of Appeal, Fifth Appellate District, and on June 20, 2007, the California Supreme Court summarily denied her petition for review. Dyer’s attempts to obtain habeas relief in the California state courts were similarly unsuccessful. On December 22, 2008, she timely filed this habeas petition under 28 U.S.C. § 2254 in the United States District Court for the Eastern District of California. The district court adopted the findings and recommendation of Magistrate Judge Sandra M. Snyder on December 14, 2009, which recommended that the petition be denied and that a certificate of appealability not issue. Dyer v. Hornbeek [sic][2], 2009 WL 3273284, 2009 U.S. Dist. LEXIS 94834 (E.D.Cal. Oct. 9, 2009). Dyer sought a certificate of appealability from this Court, which we granted on July 18, 2011.
DISCUSSION
A. Standard of Review
We review a district court’s decision to grant or deny habeas relief de novo. Bailey v. Hill, 599 F.3d 976, 978 (9th Cir.2010).
Dyer’s petition for habeas corpus relief is governed by section 2254 of the Antiterrorism and Effective Death Penalty Act of 1996 (“AEDPA”). Pursuant to 28 U.S.C. § 2254(d), as amended by AEDPA, a federal court may not grant an application for a writ of habeas corpus “with respect to any claim that was adjudicated on the merits in State court proceedings” unless the state court’s decision was “contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,” id. § 2254(d)(1), or was “based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding,” id. § 2254(d)(2). “In applying these standards of review, we look to the last reasoned decision in the state court system,” Collins v. Runnels, 603 F.3d 1127, 1130 (9th Cir.2010) (quotation marks omitted), which in this case is the March 12, 2007 opinion of the California Court of Appeal.
B. Merits
We granted a certificate of appeal-ability to allow us to review Dyer’s claim that “the trial court violated [her] constitutional right against self-incrimination and right to counsel by denying the motion to suppress [her] statements to the police.” Dyer argues that the state court’s decision with respect to this issue was an unreason *1138 able application of the Supreme Court’s seminal decision in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and its progeny.
In Miranda, the Supreme Court established that “the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination,” id. at 444, 86 S.Ct. 1602, a requirement commonly satisfied by delivery to the defendant of the familiar “Miranda warnings.” But “[a]n officer’s obligation to administer Miranda warnings attaches ... ‘only where there has been such a restriction on a person’s freedom as to render him in custody.’ ” Stansbury v. California, 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) (per curiam) (quoting Oregon v. Mathiason, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (per curiam)). The Court of Appeal affirmed the trial court’s finding that Dyer was not “in custody” at the time she made the relevant statements, and that Miranda therefore did not apply.
“In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but ‘the ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement’ of the degree associated with formal arrest.’ ” Stansbury, 511 U.S. at 322, 114 S.Ct. 1526 (quoting California v. Beheler, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (per curiam)). The question is an objective one, which we have glossed as whether a “reasonable innocent person in such circumstances” would understand that she could refuse to answer officers’ questions and leave. United States v. Booth, 669 F.2d 1231, 1235 (9th Cir.1981); see United States v. Kim, 292 F.3d 969, 978 (9th Cir.2002). “[W]hether a suspect is ‘in custody’ ... presents a mixed question of law and fact,” Thompson v. Keohane, 516 U.S. 99, 102, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995), “calling for independent review in federal court,” id.
The respondent’s argument that Dyer was not in custody emphasizes three aspects of her encounter with the police: first, that Dyer agreed to travel with detectives from outside of her home in Fowler to the police station and to answer their questions; second, that detectives permitted Dyer two unaccompanied breaks to the restroom during the interrogation; and third, that one of the interviewing detectives said to Dyer, at the beginning of the interrogation, “And you understand that you’re not in any trouble, you’re not under arrest, and that you’re free to leave at any time?” The respondent argues that a reasonable innocent person in these circumstances would have believed that she was free to stop answering the detectives’ questions and go home. Both state courts rested their decisions, in large part, on these factors.
For the reasons carefully spelled out by Judge Smith in his concurrence, we are troubled by this conclusion. The notion that Dyer’s trip to the police station was fully voluntary is questionable, because at the time she agreed to join the officers, she had been detained in a locked squad car for twenty minutes while detectives searched her home. True enough, as the respondent and the Court of Appeal have explained, the fact that detectives were executing a search warrant provided an independent legal justification for that detention, at least insofar as the Fourth Amendment is concerned, see Michigan v. Summers, 452 U.S. 692, 705, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), and that justification no longer existed by the time the detectives sought Dyer’s consent to interview her at the station. It rather strains *1139 our imagination, however, to think that the reasonable innocent person is likely to have the sort of facility with Supreme Court jurisprudence needed to understand that principle. Cf. Kim, 292 F.3d at 976-77 (explaining that “whether an individual detained during the execution of a search warrant has been unreasonably seized for Fourth Amendment purposes and whether that individual is ‘in custody’ for Miranda purposes are two different issues”).
As to the other factors — the unaccompanied breaks and the pre-interview assurance that Dyer was not in trouble' — we do not deny their relevance. But we also acknowledge other aspects of the interrogation — its four-hour duration, the time of night at which it was conducted, the distance between the police station and Dyer’s home, and the extent to which Dyer was confronted with evidence of her own guilt — on the other side of the scale. See id. at 974 (identifying factors relevant to custody determination).
Despite our doubts, however, we are bound by AEDPA’s exacting requirements. What section 2254(d)(1) says, as relevant here,[3] is that habeas relief is appropriate only to remedy a state court’s “unreasonable application of’ clearly established Supreme Court precedent. We are thus required to affirm the district court’s denial of Dyer’s petition, unless the state court’s decision in the matter was “so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.” Harrington v. Richter, — U.S. -, 131 S.Ct. 770, 786-87, 178 L.Ed.2d 624 (2011). We conclude that Dyer cannot satisfy that standard.
We think that a fairminded jurist could, on this record, find that Dyer was not in custody, because many presumably fair-minded jurists have indeed so found on facts similar to these. Although “only Supreme Court holdings are binding on state courts,” Rodgers v. Marshall, 678 F.3d 1149, 1155 (9th Cir.2012), “[cjircuit precedent may provide persuasive authority for purposes of determining whether a state court decision is an ‘unreasonable application’ of Supreme Court precedent.” Id. (quotation marks omitted). And there is authority — from the Supreme Court, this Court, and from other circuits — that treats the combination of factors relied upon by the respondent as precluding a finding that Dyer was in custody.
In Oregon v. Mathiason, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977), for example, the Supreme Court explained that the suspect “came voluntarily to the police station, where he was immediately informed that he was not under arrest” in finding that he was not in custody. Id. at 495, 97 S.Ct. 711. We reasoned similarly in this Court’s en banc opinion in United States v. Crawford, 372 F.3d 1048, 1059-60 (9th Cir.2004) (en banc). There, we noted that the “[djefendant agreed to go to the FBI office,” and we explicitly labeled as “most significant for resolving the question of custody” the fact that the “[defendant was expressly told that he was not under arrest.” Id. We rejected the defendant’s argument, which is not unlike Dyer’s, that “because [the suspect] was detained during *1140 [a] parole search and officers had entered his bedroom with weapons drawn, his later questioning at the FBI office amounted to custodial interrogation.” Id. at 1059.
The case law contains many other examples of courts relying on similar factors to conclude that a suspect was not in custody. See, e.g., Beheler, 463 U.S. at 1122, 103 S.Ct. 3517 (noting that the defendant “voluntarily agreed to accompany police to the station house”); Bains v. Cambra, 204 F.3d 964, 972 (9th Cir.2000) (relying, in context of a § 2254 petition, on fact that petitioner “either ... himself suggested that his questioning by the police continue at the police station or he simply chose not to object when the police suggested [it]”); United States v. Bassignani, 575 F.3d 879, 886 (9th Cir.2009) (“We have consistently held that a defendant is not in custody when officers tell him that he is not under arrest and is free to leave at any time.”); United States v. Norris, 428 F.3d 907, 912 (9th Cir.2005) (“[The suspect] was told that his cooperation was voluntary and that he was free to terminate the interview at any time.”); United States v. LeBrun, 363 F.3d 715, 722 (8th Cir.2004) (en banc) (“[T]he defendant was not in custody because, among other things, the officers told him that he was free to leave and that he would not be arrested.... ”).
Our independent consideration of other factors relevant to the custody determination confirms that the result reached by the Court of Appeal was objectively reasonable. The principal circumstances relied upon by Dyer in arguing that she was in custody were mitigated somewhat by still other aspects of her encounter.
One such consideration is the physical surroundings of the interrogation. See Kim, 292 F.3d at 974. It is true that Dyer’s interrogation took place in a police station, which is, of course, precisely the sort of setting the Supreme Court had in mind when it decided Miranda. But the Supreme Court has since “explicitly recognized that Miranda warnings are not required simply because the questioning takes place in the station house.... ” Beheler, 463 U.S. at 1125, 103 S.Ct. 3517 (quotation marks omitted). It seems to us to follow that circumstances may soften the police station’s inherently intimidating atmosphere, or at least that detectives may take steps so as not to amplify it. That was arguably so here. Dyer was interviewed in a nondescript, fifteen-by-fifteen foot room — small, but not oppressively so — in what appears to have been a public-facing area of the station house. The Court of Appeal noted that during a break, Dyer “got up, left the room, walked to the restroom (approximately 30 yards away), used the restroom, and returned to the interview room,” Lopez, 2007 WL 738787, at *9, 2007 Cal.App. Unpub. LEXIS 1978, at *26, and Detective Chapman testified that she could have exited the station from there, Testimony of Detective Mark Chapman, Transcript of Miranda Hearing, March 19, 2004, E.R., vol. I, ex. 3, at 1776-77. So it is not as though Dyer was locked in the bowels of the station house, with no idea which way was out. Indeed, nothing in the record suggests that the detectives did anything to heighten her sense of seclusion.
Another relevant consideration is the tone of the interrogation. Bassignani, 575 F.3d at 884. Although “[w]e have found a defendant in custody when the interrogator adopts an aggressive, coercive, and deceptive tone,” id., the Supreme Court has also cautioned generally that “[p]loys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within Miranda’s concerns,” Illinois v. Perkins, 496 U.S. 292, 297, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990) (citing Mathiason, 429 U.S. at 495-96, 97 S.Ct. 711). We do not read the transcript of the *1141 interrogation here to suggest the sort of tone that would communicate to a reasonable innocent person that her participation was not voluntary. To be sure, Dyer was sporadically confronted with accusations and elliptical references to evidence of her guilt.[4] But this tone was not pervasive. More often, the detectives employed the sort of tactics referred to in Perkins, which work for the very reason that they cultivate in the suspect a sense of trust and voluntariness, false though that sense may be. The transcript also reveals lengthy portions of the interrogation that took a purely investigatory tone, in addition to repeated confirmations that detectives had not made threats or promises to Dyer. See Tr. of Pet’r’s Interview, March 29, 2002, E.R. vol. I, ex. 2, at 35, 49, 51, 77. The tone of the interview therefore does not weigh as heavily in favor of a custody determination as Dyer suggests.
Ultimately, we are persuaded that the Court of Appeal’s understanding of the foregoing principles in the context of this case, and its conclusion that a reasonable innocent person in Dyer’s position would have understood herself to be free to ignore the detectives’ inquiries and leave, are reasonable. So even if we think that Dyer’s consent to speak with police may have been influenced by her limited detention while the search was being executed, or that the force of the detectives’ promise that Dyer was free to leave may have been blunted by other aspects of the encounter, we cannot reject the Court of Appeal’s ultimate decision. “[Section] 2254(d)’s highly deferential standard for evaluating state-court rulings ... demands that state-court decisions be given the benefit of the doubt.” Woodford v. Visciotti, 537 U.S. 19, 24, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (citations and internal quotation marks omitted). Giving the Court of Appeal that benefit here, we affirm the judgment of the district court denying Dyer’s application for habeas relief under 28 U.S.C. § 2254.
CONCLUSION
For the foregoing reasons, the judgment of the district court is AFFIRMED.

. Except where noted, the following, largely-undisputed facts are drawn from the California Court of Appeal's opinion, People v. Lopez et al., 2007 WL 738787, 2007 Cal.App. Unpub. LEXIS 1978 (Cal.Ct.App. Mar. 12, 2007). See 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.”).

. The district court opinion appeared to refer to the respondent as “Hornbeek” in the case caption, and “Hornbeak” in the appearance of counsel, see Dyer, 2009 WL 3273284, at *1, 2009 U.S. Dist. LEXIS 94834, at *1, E.R. vol. 11, ex. 30, at 1, but we are confident that the proper spelling is "Hornbeek,” see e.g., Potter v. Hornbeck, - U.S. -, 133 S.Ct. 120, 184 L.Ed.2d 57 (2012).

. Insofar as Dyer argues that the Court of Appeal’s decision was either "contrary to” Supreme Court precedent, 28 U.S.C. § 2254(d)(1), or that it rested on an "unreasonable determination of the facts,” id. § 2254(d)(2), those arguments are without merit. The Court of Appeal correctly identified the governing legal principles, and its decision does not contradict a Supreme Court holding on "materially indistinguishable” facts. Moses v. Payne, 555 F.3d 742, 751 (9th Cir.2009). Nor has Dyer presented "clear and convincing” evidence rebutting the presumption of correctness that attaches to the state court’s determinations of the facts. See 28 U.S.C. § 2254(e)(1).

. Among them: "Other people have said, have told us that you’re the person that killed him,” Tr. of Pet’r’s Interview, March 29, 2002, E.R. vol. I, ex. 2, at 34; "I know you’re scared. I can see your, your heart’s pumping pretty fast right now, and your heart's not pumping fast because you didn't do anything. We know you did, and it's okay,” id. at 45; "At 1:51 a.m. on Friday morning there was a phone call to your residence from D.J.’s telephone, it's right here,” id. at 40. See also id. at 13, 29-30, 37.