**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

<table>
<tr><td>

JOVAN'Z SMITH,<br>
     *Petitioner-Appellant*,<br>
<br>
v.<br>
<br>
KEN CLARK, Warden,<br>
     *Respondent-Appellee*.

</td><td>

No. 14-15162<br>
<br>
D.C. No.<br>
2:11-cv-03312-<br>
MCE-GGH<br>
<br>
<br>
ORDER

</td></tr>
</table>

Filed October 22, 2015

Before: Consuelo M. Callahan, Milan D. Smith, Jr.,
and Paul J. Watford, Circuit Judges.

Order;
Dissent by Judge Fletcher;
Concurrence by Judge Callahan and Judge M. Smith

## SUMMARY[*]

### Habeas Corpus

The panel filed an order rejecting a sua sponte en banc call in a case in which the panel affirmed California state prisoner Jovan'z Smith's habeas corpus petition conviction for assault on a child causing death.

Dissenting from the denial of rehearing en banc, Judge W. Fletcher wrote that the California Court of Appeal's conclusion that Smith was not "in custody" under *Miranda* rested on a misreading of *California v. Beheler*, 463 U.S. 1121 (1983) (per curiam) – *i.e.*, that *Beheler* establishes a bright-line rule that a suspect who has been told repeatedly that he is "not under arrest" is not "in custody" under *Miranda*. Judge Fletcher wrote that this is not the law, and that a police officer cannot remove an interrogation from *Miranda*'s reach simply by reciting magic words.

Concurring in the denial of rehearing en banc, Judges Callahan and M. Smith disagreed with the Judge W. Fletcher's characterization of the state appellate court's decision, description of the circumstances surrounding Smith's interview, and legal conclusions.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## ORDER

A sua sponte call for a vote on rehearing this case en banc was made by an active judge of this court. The call failed to receive a majority of the votes of the nonrecused active judges. Fed. R. App. P. 35. The sua sponte en banc call is rejected. Judge Fletcher's dissent from denial of rehearing en banc and Judge Callahan and Judge Smith's concurrence in denial of rehearing en banc are filed concurrently with this Order.

---

W. FLETCHER, Circuit Judge, dissenting from the denial of rehearing en banc:

In this case, a 16-year-old high school student named Jovan'z Smith was taken to a police station and subjected to four hours of interrogation in a small, windowless room. Smith was not read his *Miranda* rights. Four hours later, still without his *Miranda* warnings, he confessed. The only question before this court is whether Smith was "in custody" under *Miranda* when he confessed.

The California Court of Appeal concluded that Smith was not "in custody." It relied exclusively on the "fact" that, in the words of the court, he "was told three times that he was not under arrest and was free to go." *See People v. Smith*, No. A125912, 2010 WL 4233298, at *3 (Cal. Ct. App. Oct. 27, 2010) (unpublished). In an unpublished disposition, a three-judge panel of this court denied his petition for a writ of habeas corpus, concluding that the Court of Appeal's opinion, while suspect, was neither "contrary to," nor involved "an unreasonable application of, clearly established Federal law."

28 U.S.C. § 2254(d)(1). *Smith v. Clark*, No. 14-15162, 2015 WL 2119461, at *2 (9th Cir. May 7, 2015).

I disagree. Smith was clearly "in custody" under *Miranda*. The California Court of Appeal's conclusion to the contrary rested on a misreading of *California v. Beheler*, 463 U.S. 1121 (1983) (per curiam). In the Court of Appeal's reading, *Beheler* establishes a bright-line rule that a suspect who has been told repeatedly that he is "not under arrest" is not "in custody" under *Miranda*. But this is not the law. A police officer cannot remove an interrogation from *Miranda*'s reach simply by reciting magic words. We should have corrected the Court of Appeal's error. Smith's conviction, and many others, hang in the balance.

I respectfully dissent from our decision not to rehear this case en banc.

## I. Background

### A. Smith

Jovan'z Smith was 16 years old when he was taken from his classroom and brought to the Vallejo Police Department for questioning. Over the next four hours, he was interrogated in a small windowless room by a team of three police officers about the choking death of his daughter. The officers took his cell phone and did not return it; they evaded his questions about whether he was free to leave, at one point clearly implying that he could not leave as long as officers still had questions; they arranged for his daughter's maternal grandmother to come to the station to question and berate him; they administered a lie detector test, which they told him he failed; after the lie detector test, they repeatedly told him

that he was lying; they then told him, "You can't leave this room lying." Smith confessed only after he had been told that he could not leave the room lying. After he confessed, the officers read him his *Miranda* rights. Smith then repeated the confession he had just given.

The California Court of Appeal's decision that Smith was not in "custody" for the purposes of *Miranda v. Arizona*, 374 U.S. 436 (1966), turned on the "fact" that Smith, according to the Court of Appeal, "was told three times that he was not under arrest and was free to go." *Smith*, 2010 WL 4233298, at *3. This misstates the record: Smith was told only once, at the beginning of the interrogation, that he was "free to go."

Smith was, however, told three times that he was "not under arrest." The first time was at Smith's high school, when a uniformed Vallejo police officer told him he was "not under arrest" but that an investigator wanted to speak to him. Smith agreed to accompany the officer to the Vallejo Police Department. They drove to the police station in a patrol car, with the officer in the front and Smith in the back. According to the officer, they had a "friendly conversation" on the way to the station. Once at the station, the officer placed Smith in an interview room. It was roughly 2:30 PM.

The second time was in the interview room, at the beginning of Smith's interrogation, when Detective Sharon Fong entered the room, introduced herself, and told Smith he was "not under arrest" and was "free to leave at any time." It was roughly 2:33 PM.

Fong and Smith spoke for about twenty minutes, during which time Smith offered the first of several explanations

about what happened to his 18-month-old daughter, T. Smith told Fong he had accidentally left baby wipes on T.'s bed. He said that he turned away, and when he turned back, T. was "turning purple" and "throwing up blood." He said that the doctors later told him that T. had swallowed a baby wipe.

Around 2:55 PM, a second police officer, Detective Eric Mustard, entered the interview room. Over the next half hour, Mustard asked increasingly hostile questions. He asked Smith how many children he had. He asked Smith how many girlfriends he had. He told Smith, "Honesty is a huge issue right here. . . . So be real honest with me." He expressed skepticism that T. would have swallowed the baby wipes, and noted that "we will figure that out . . . forensically." He said, "[S]ometimes we get caught up in the moment and we do something that we regret and we feel bad for." He suggested that Smith confess, and told Smith that if he did not, and it later came out that he had lied, "people are gonna look at you and judge you as a cold-hearted son-of-a-bitch." When Mustard left the room, he took Smith's cell phone.

Around 4:10 PM, Mustard returned with T.'s maternal grandmother, N. N. began to cry almost immediately. Mustard told Smith, "You can look at me and you can tell me whatever story you want to tell me, [but] that's blood to that lady." He told Smith again that he did not believe his story:

> I told you this earlier and I tell you again, you gotta do the right thing, man, 'cause if you want to be a good person, if you want people to think you're a good person, if something bad happened, an accident happened and this wasn't something that's cold . . . A lotta things runnin' through your mind right now,

> I know that. I told you if the truth comes out today I can help you. If it comes out tomorrow or the next day or next week I can't help you. Today, the truth.

He asked: "Can you look that lady in the eye and tell her you didn't do that?" N. then told Smith that her granddaughter, T., was brain-dead.

Around 4:50 PM, after N. and Mustard had left, Detective Frank Pucci arrived to conduct a lie detector test. As Pucci set up the test, Smith asked, "After this, will I be able to go home?" Pucci responded, "You know what, what I don't know is, are you and Detective Mustard done talking?" Smith replied, "I don't know." Pucci said, "Okay, um, yeah. You understand you're not under arrest, okay? We're just trying to gather all the facts." Pucci ended the exchange by saying, "So there may be some questions with Detective Mustard, I don't know. Alright?" This was the third and final time Smith was told that he was "not under arrest." It was roughly 4:55 PM.

The interrogation continued for another hour and a half. During the lie detector test, Pucci asked Smith whether he had put the baby wipe in T's mouth. Smith said that he had not. After the test, Pucci left the interview room. When Pucci returned with Mustard, he told Smith that he had failed the test. The officers told Smith to "be honest," and not to "lie to [him]self." Smith changed his story somewhat, stating that he had seen T. choking on the baby wipe and had reached in to take it out. He maintained, however, that he had not intentionally hurt her.

The officers insisted that Smith was lying. Pucci asked, "Jovan'z, it didn't happen like that, did it?" Smith said it had. Pucci said, "I hear what you're saying. But it didn't happen like that." Smith repeatedly insisted that it had, reiterating that he had gotten up to change the channel on the television and had turned around to find T. choking. Finally, Pucci told him: "Don't lie, man. You can't leave this room lying, bro." It was 6:10 PM.

Twenty minutes later, after he had been told "you can't leave this room lying," Smith confessed. He told his interrogators that he had pushed the baby wipes into T.'s mouth in a moment of anger. Mustard suggested that they take a break, and that Smith "write that little girl a letter" and tell her that he was sorry. Shortly thereafter, the officers brought Smith a slice of pizza, the first food he had been given since he arrived at the station. Around 8:30 PM, in a different room in the station, the officers finally read Smith his *Miranda* warnings. In response to questions, Smith repeated the confession he had given earlier. It had been six hours since he was first brought to the police station.

Smith was prosecuted for murder and assault of a child causing death. He moved to suppress his statements as obtained in violation of *Miranda*, but the motion was denied. The jury watched a tape of his pre-*Miranda* interrogation. The jury hung on the murder charge but convicted him of the assault charge, and Smith was sentenced to 25 years to life in state prison.

## B.  *Beheler*

What happened to Smith in the police station is not unusual. As Professor Charles Weisselberg has extensively

documented, police officers in California are specifically instructed to inform suspects that they are "not under arrest" in order to "ma[k]e certain that the interrogation w[ill] be seen as non-custodial." Charles D. Weisselberg, *Mourning Miranda*, 96 Cal. L. Rev. 1519, 1542–44 (2008). This is known as a "*Beheler* admonishment," after *California v. Beheler*, 463 U.S. 1121 (1983) (per curiam). The defendant in *Beheler*, who gave an inculpatory statement to the police, had been "specifically told that he was not under arrest." *Id.* at 1122. The California police academies have interpreted *Beheler* to mean that, if a police officer says the magic words, telling a suspect that he is "not under arrest," the suspect will not be found to have been in "custody" under *Miranda*.

*Beheler* admonishments play a major role in instructional material produced by the California Commission on Peace Officer Standards and Training ("POST"). As Weisselberg documents, one set of POST training materials describe *Beheler* as "a wonderful case for use." Weisselberg, *supra*, at 1542. Another POST course dramatizes the use of *Beheler* admonishments on a suspect in connection with "the full toolkit of interrogation tactics," including confrontation and minimization techniques (the use of sympathy and justifications to induce a confession). *Id.* at 1544. The same POST course features a debate between experts on whether, if a suspect attempts to exercise his right to leave the interview, the police should allow him to do so. *Id.*

The use of *Beheler* admonishments is not limited to California. Cases from the federal courts, and over 31 state courts, demonstrate the use of similar tactics nationwide. *Id.* at 1545 nn.140–41; *see, e.g.*, *United States v. McCarty*, 475 F.3d 39, 46 (1st Cir. 2007); *United States v. LeBrun*, 363 F.3d 715, 718 (8th Cir. 2004); *Fitzpatrick v. State*,

900 So. 2d 495, 510 (Fla. 2005); *State v. Munoz*, 972 P.2d 847, 856 (N.M. 1998); *State v. Hobson*, 648 A.2d 1369, 1370–72 (R.I. 1994); *State v. Bronson*, 496 N.W.2d 882, 889 (Neb. 1993). An FBI publication from the 1980s similarly instructs federal agents to inform suspects that they are not under arrest, "thus negating the need for the [*Miranda*] warning." *See* Charles E. Riley III, *Finetuning* Miranda *Policies*, FBI Law Enforcement Bull. 23, 24–25 (1985); *see also* Weisselberg, *supra*, at 1546 nn.145–46.

As Weisselberg notes, the use of *Beheler* admonishments is clearly strategic in nature. *Beheler* admonishments help police officers (falsely) convey to suspects that they are not under suspicion, thereby enhancing the effectiveness of "soft" tactics, such as minimization, that induce confessions. But they also have an even more powerful effect. As interpreted by the police and California state courts, they serve as virtually conclusive evidence that a suspect was not in "custody" during an interrogation, and therefore that no *Miranda* warnings were required. In other words, they permit police officers to remove confessions from *Miranda*'s reach.

Sometimes, it will not be possible to determine whether police officers used *Beheler* admonishments strategically. In this case, however, it is easy. At 3 PM, Detective Mustard entered the interview room to take over Smith's interrogation. Before he asked Smith any questions, however, Mustard turned to Detective Fong and asked, "Are you *Beheler*-ing here?" Fong answered, "Yes."

## C. *Smith*

Smith appealed his conviction to the California Court of Appeal. His sole argument was that the videotape should

have been suppressed because it was obtained in violation of *Miranda* because he had been in custody when he first confessed. The Court of Appeal denied his claim. It held that "the trial court's ruling was well supported." *Smith*, 2010 WL 4233298, at *3. It explained:

> The record here indicates that appellant was told three times that he was not under arrest and that he was free to go. The first occurred when appellant was at school. Officer Barrientos told appellant he was not under arrest and he asked appellant whether he was willing to answer some questions at the police station. The second time occurred when Detective Fong began interviewing appellant at the police station. Fong told appellant that he was not under arrest and that he was free to terminate the interview and leave at any time. The third time occurred when Detective Pucci came into the interview room to give appellant a voice stress test. Appellant asked Pucci whether he could leave after the test. Pucci said he did not know, but he then went on to tell appellant yet again that he was not under arrest. *We think a reasonable person who is told repeatedly that he is not under arrest and that he is free to go would understand that he is not under arrest and that he is free to go.* We conclude the trial court ruled correctly.

*Id.* (emphasis added).

On federal habeas review, the magistrate judge concluded Smith's was a "close case." *Smith v. Clark*, No. 2:11-CV-3312, 2013 WL 4409717, at \*1 (E.D. Cal. Aug. 15, 2013). It concluded that if Smith's age were taken into consideration, as required by *J.D.B. v. North Carolina*, 131 S. Ct. 2394 (2011), the state court's conclusion that Smith was not "in custody" would be "unreasonable" under 28 U.S.C. § 2254(d) and *Harrington v. Richter*, 562 U.S. 86, 101 (2011). *Id.* at \*1. Because *J.D.B.* postdated the Court of Appeal's decision, however, the magistrate judge concluded that the Court of Appeal did not err in not factoring Smith's age into its analysis, and that, absent consideration of Smith's age, the court's decision was not "unreasonable" under § 2254(d). *Id.* at \*26. The district court approved the magistrate judge's recommendation that habeas be denied, but it certified for appeal the question whether the interrogation was custodial.

A three-judge panel affirmed the denial of Smith's petition, relying in large part on the rationale of the magistrate judge. *See Smith*, 2015 WL 2119461, at \*2. Judge Watford concurred. *See id.* at \*3–6 (Watford, J., concurring). He wrote that he found the denial of Smith's motion to suppress "troubling." *Id.* at \*3. Despite his "misgivings," however, Judge Watford felt "compelled to affirm under AEDPA." *Id.* at \*6.

## II. Discussion

As this case illustrates, the California courts — and the California police academies — have misread *Beheler*. They interpret it as creating a bright-line rule that a suspect who has been told repeatedly that he is "not under arrest" is not "in custody" under *Miranda*. But *Beheler* does not stand for such

a rule, nor could it. It has never been the law that a police officer can insulate an otherwise clearly custodial interrogation from *Miranda*'s reach simply by telling a suspect that he or she is "not under arrest." Because Smith's conviction rests on the Court of Appeal's erroneous understanding of what it means to be "in custody" under *Miranda*, we should have granted his petition for a writ of habeas corpus.

Under AEDPA, we may grant a petition for a writ of habeas corpus only if the state court judgment was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." *See* 28 U.S.C. § 2254(d)(1). We "look to the last reasoned state court adjudication on the merits of [Smith's] *Miranda* claim, which was the decision of the California Court of Appeal." *Thompson v. Runnels*, 705 F.3d 1089, 1096 (9th Cir. 2013). There is no question that the Court of Appeal's judgment was "contrary to" the law set forth by the Supreme Court in a long line of cases ranging from *Howes v. Fields*, 132 S. Ct. 1181 (2012), to *Yarborough v. Alvarado*, 541 U.S. 652 (2004), to *Thompson v. Keohane*, 516 U.S. 99 (1995), to *Beheler* itself.

*Miranda* holds that certain warnings are required in the context of custodial interrogations given "the compulsion inherent in custodial surroundings." *See* 384 U.S. at 458. The word "custody" is a "term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes*, 132 S. Ct. at 1189. In determining whether a person is in "custody" for purposes of *Miranda*, the Supreme Court has held that "[t]wo discrete inquiries are essential: first, what are the circumstances surrounding the interrogation; and second, given those

circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson*, 516 U.S. at 112. The "ultimate inquiry" is whether there was "a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Id.* If there is, *Miranda* warnings are required.

The Supreme Court has repeatedly instructed courts to "examine 'all of the circumstances surrounding the interrogation.'" *Fields*, 132 S. Ct. at 1189 (quoting *Stansbury v. California*, 511 U.S. 318, 322 (1994) (per curiam)). Relevant factors include

> the location of the questioning, *see Maryland v. Shatzer*, 130 S. Ct. 1213, 1223–26 (2010), its duration, *see Berkemer v. McCarty*, 468 U.S. 420, 437–38 (1984), statements made during the interview, *see Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam); *Alvarado*, 541 U.S. at 665; *Stansbury*, 511 U.S. at 325, the presence or absence of physical restraints during the questioning, *see New York v. Quarles*, 467 U.S. 649, 655 (1984), and the release of the interviewee at the end of the questioning, *see Beheler*, 463 U.S. at 1122–23.

*Fields*, 132 S. Ct. at 1189 (citations altered); *see also United States v. Kim*, 292 F.3d 969, 974 (9th Cir. 2002).

In this case, virtually all of these factors lead to a conclusion that Smith was in "custody" under *Miranda*. Smith was interrogated for four hours (and held for nearly six) before he was read *Miranda* warnings. He was

interrogated in a small windowless room in "the bowels" of the police station. His cell phone was taken from him and not returned. Although the interrogating officers were friendly at first, they quickly became hostile. Within an hour they had all but stated that they suspected him of T.'s death. Smith finally agreed to take a lie detector test, which the officers told him that he had failed. When he continued to maintain his innocence, the officers told him flatly that they did not believe him: "Jovan'z, it didn't happen like that," said one. "You can't leave this room lying, bro," said the other. No reasonable person in these circumstances — whether a sixteen-year-old or a mature adult — would think that he was free to leave until he told a story that the officers believed.

The Court of Appeal's contrary conclusion rested entirely on the "fact" that, in its words, Smith "was told three times that he was not under arrest and that he was free to go." As a preliminary matter, this misstates the record: Smith was not told three times that he was "free to go." He was told only once, before questioning began, that he was free to go. Instead, he was told three times that he was "not under arrest." A lay person understands that the statement "you're free to go" means precisely that, but a lay person does not necessarily understand that the statement "you're not under arrest" means "you're free to terminate the interrogation and leave."

Further, the officers' three statements that Smith was "not under arrest" would not lead a reasonable person to feel that he was free to terminate the interrogation under the circumstances here. The first two admonishments came early, once at the high school and then before the interrogation had begun. And the third admonishment could hardly have put Smith on notice that he was free to leave once

the interrogation had begun. The third admonishment was given when Smith asked Detective Pucci whether he could go home after taking the lie detector test. Judge Watford, concurring separately in the panel disposition, put it well:

> The officer didn't respond with the only answer consistent with Smith's supposed freedom to leave, which would have been "yes, of course." Instead, he told Smith, "Hey, you know, I don't know. Are you and Detective Mustard done talking?" That response seems pretty clearly to indicate that Smith *wasn't* free to leave whenever he chose but rather only when Detective Mustard had finished interrogating him. That the officer hastily added, "You understand you're not under arrest, okay?" doesn't seem to change anything.

*Smith*, 2015 WL 2119461, at *5 (Watford, J., concurring).

Thus, even if I thought the Court of Appeal had applied the correct standard — and I do not — I would conclude it had unreasonably applied it. Each of the factors that the Supreme Court has told us to consider when determining whether someone is "in custody" under *Miranda*, except one, point toward the conclusion that Smith was in custody. And the admonishments that he was not under arrest were of basically no use to Smith — two were provided four hours before he confessed, and the third conveyed the opposite message that the Court of Appeal interpreted it to convey.

The Supreme Court has instructed lower courts to weigh *all* of the circumstances surrounding an interrogation to

determine whether it was "custodial." *See Howes*, 132 S. Ct. at 1189. But the Court of Appeal brushed aside these circumstances in favor of a bright-line rule that verbal admonishments alone are sufficient to assure a reasonable person that he is "free to go": "We think a reasonable person who is told repeatedly that he is not under arrest and that he is free to go would understand that he is not under arrest and that he is free to go." *Smith*, 2010 WL 4233298, at *3. It then rejected every argument that Smith made by invoking the "fact" that he had been told, three times, that he was "not under arrest" and was "free to go."

Smith first argued that a California Supreme Court case, *People v. Ochoa*, 19 Cal. 4th 353 (1998), supported his claim that he was "in custody" under *Miranda*. The Court of Appeal rejected Smith's analogy to *Ochoa*, relying exclusively on the number of times the police had told Smith that he was free to go. It wrote: "The situation here is even more clear than [in] *Ochoa* because the appellant [Smith] *was told specifically and repeatedly that he was not under arrest and that he was free to go*. Like *Ochoa* we conclude a reasonable person in appellant's position would understand he was free to go." *Smith*, 2010 WL 4233298, at *3 (emphasis added).

Smith next argued that he was "in custody" because (1) he was taken to the police station in a patrol car and (2) he was interrogated for over four hours at the station. The Court of Appeal dismissed both facts as irrelevant on the ground that Smith had been told three times that he was "not under arrest." It wrote: "While appellant rode to the police station in a patrol car, he did so only after agreeing to do so and *after being told specifically that he was not under arrest*." *Id.* (emphasis added). The court explained that "[a]ny coercion

that might otherwise have been present due to the length of the questioning was lessened by the fact that at three different points during that questioning, *appellant was told that he was not under arrest*." *Id.* (emphasis added).

Finally, Smith argued that he was "in custody" because he had asked several times whether he could leave. In particular, he pointed to the conversation he had with Detective Pucci reproduced above. In this conversation, Smith asked Pucci if he could leave after he had finished the lie detector test. Pucci responded, "Hey, you know, I don't know. Are you and Detective Mustard done talking?" In other words, Pucci suggested to Smith that he was *not* free to leave. But the Court of Appeal dismissed the relevance of this exchange on the same ground it dismissed Smith's other arguments: "Pucci then went on to tell appellant that he was *not under arrest*. *We think a reasonable person who is told that he is not under arrest would understand that he is not in custody.*" *Id.* at *4 (emphasis added).

The Court of Appeal, in other words, dismissed every single one of Smith's arguments as to why he was "in custody" under *Miranda* on the same ground. It held that none of his arguments was persuasive in light of the fact that Smith had been told repeatedly that he was not under arrest. This is not the law. A police officer cannot transform a clearly custodial interrogation into a non-custodial interrogation simply by telling a suspect that he is "not under arrest." Such a rule would render *Miranda* a dead letter.

The California courts (and the California police academies) have interpreted *California v. Beheler*, 463 U.S. 1121, as authorizing such a rule. But *Beheler* does no such thing. In *Beheler*, the defendant had gone to the police

station voluntarily "although the police specifically told [him] that he was not under arrest." 463 U.S. at 1122. He spoke to police officers for 30 minutes and then returned home. *Id.* He later challenged his statement as obtained in violation of *Miranda*, and the California Court of Appeal agreed, concluding that Beheler had been "in custody" during the interview. *Id.* at 1123. The Supreme Court reversed. It held that the case was indistinguishable from *Mathiason*, 429 U.S. 492, in which a defendant had voluntarily gone to the police station and given a short interview. *Id.* at 1123–24. The Court did not rely on — indeed, did not even mention, except in its initial discussion of the facts — the fact that Beheler had been told he was not under arrest.

The bright-line rule on which the Court of Appeal relied in this case finds no support in *Beheler*, nor in any other Supreme Court case. The cases that tell us what it means to be "in custody" under *Miranda* instruct us to consider *all* of the relevant circumstances in making that determination. *See Fields*, 132 S. Ct. at 1189; *Alvarado*, 541 U.S. at 663; *Thompson*, 516 U.S. at 112. And *Beheler*, rather than announcing or applying a new rule, applied the same "totality-of-the-circumstances" rule described in these later cases. *See* 463 U.S. at 1125. Because the Court of Appeal "applie[d] a rule that contradicts the governing law set forth in [Supreme Court] cases," its judgment was "contrary to" clearly established federal law, *see Williams v. Taylor*, 529 U.S. 362, 405 (2000), and Smith's petition for a writ of habeas corpus should have been granted.

*Miranda* rests on the proposition that "custody" is an objective circumstance, something that courts can identify after the fact by looking at a relatively small number of fixed indicia. But the rule applied by the Court of Appeal allows

police to render these indicia irrelevant. Under the Court of Appeal's misreading of *Beheler*, "custody" is no longer an objective inquiry. Police officers can easily manufacture a finding that a suspect is not in "custody" — and thereby evade *Miranda* — even when every coercive factor we associate with custodial interrogation is present, and even when (as here) the suspect clearly does not feel free to leave. All they need to do is say the magic words: "You're not under arrest."

By permitting Smith's conviction to stand, we effectively allow the police to remove unwarned confessions from *Miranda*'s reach by reciting a few short words. Nothing in *Miranda*, in *Beheler*, or in any other case sanctions such an unwise and unfair result.

* * *

This is a close case only because we are reviewing the decision of the Court of Appeal on habeas, under the deferential standard required by AEDPA. If this case had come to us on direct review, it would be easy. I regret that our court has declined to rehear this case en banc, but I understand, given its procedural posture, my colleagues' reluctance to do so.

It may be that the only way to put a stop to "*Beheler*-ing," as practiced by the police in California and as tolerated by the California state courts, will be to seek direct review by the United States Supreme Court. I have little doubt what the Court's answer will be if the question is presented on direct rather than on collateral review. The sooner we get that answer the better.

CALLAHAN, Circuit Judge, and M. SMITH, Circuit Judge, concurring in the denial of rehearing en banc:

With all due respect to our dissenting colleague, we disagree with his characterization of the state appellate court's decision, description of the circumstances surrounding Jovan'z Smith's interview, and legal conclusions. Out of fairness to all concerned, including the California jurists who reviewed Smith's case on appeal, we offer this concurrence in response to his dissent.

## I.

In this case, the *Miranda* inquiry arises within the context of habeas review under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). "An officer's obligation to give a suspect *Miranda* warnings before interrogation extends only to those instances where the individual is 'in custody.'" *United States v. Kim,* 292 F.3d 969, 973 (9th Cir. 2002). In determining whether a suspect is in custody, "[t]wo discrete inquiries are essential." *Thompson v. Keohane,* 516 U.S. 99, 112 (1995). First, a court must determine "what . . . circumstances surround[ed] the interrogation." *Id.* Second, a court must decide whether "a reasonable person [in those circumstances would] have felt he or she was not at liberty to terminate the interrogation and leave." *Id.* "The custody determination is objective and is not based upon 'the subjective views of the officers or the individual being questioned.'" *United States v. Bassignani*, 575 F.3d 879, 883 (9th Cir. 2009); *see also Stansbury v. California,* 511 U.S. 318, 323 (1994). Courts have identified numerous circumstances to be pertinent in assessing the custody question. *See Howes v. Fields*, 132 S. Ct. 1181, 1189 (2012); *Kim*, 292 F.3d at 974.

On direct appeals, *Miranda* claims present mixed questions of law and fact that we review de novo. *United States v. Cazares*, 788 F.3d 956, 979 (9th Cir. 2015). In this case, however, we are bound by AEDPA. *See Yarborough v. Alvarado*, 541 U.S. 652, 665 (2004) (applying AEDPA on habeas review of a challenge based on *Miranda*). AEDPA authorizes the grant of a state prisoner's petition for a writ of habeas corpus when the relevant state-court decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court" or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The Court must "look to the last reasoned state court adjudication on the merits of [Smith's] *Miranda* claim, which was the decision of the California Court of Appeal." *Thompson v. Runnels*, 705 F.3d 1089, 1096 (9th Cir. 2013).

A state court decision is "contrary to" federal law within the meaning of § 2254(d)(1) if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or "the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court]." *Williams v. Taylor*, 529 U.S. 362, 405 (2000). "Thus, the 'contrary to' prong requires a direct and irreconcilable conflict with Supreme Court precedent." *Murray v. Schriro*, 745 F.3d 984, 997 (9th Cir. 2014).

A state court decision is an "unreasonable application" of Supreme Court precedent within the meaning of § 2254(d)(1) if "the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," or "the

state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407. The Supreme Court has repeatedly emphasized that "'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011). "The deferential standard imposed under AEDPA cloaks a state court's determination with reasonableness, so long as 'fairminded jurists could disagree' as to whether a claim lacks merit." *Murray*, 745 F.3d at 998 (quoting *Alvarado*, 541 U.S. at 664). Thus, "a habeas court must determine what arguments or theories supported or . . . could have supported[] the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Harrington*, 131 S. Ct. at 786.

Importantly, state courts are given even "more leeway" in cases like this one, where the rule applied is general in nature, requiring a case-by-case assessment based on the totality of the circumstances. *Alvarado*, 541 U.S. at 664. Emphasizing the stringency of § 2254(d)(1), the Supreme Court has cautioned that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington*, 131 S. Ct. at 786; *see also Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).

## II.

Our dissenting colleague believes that habeas relief should have been granted for two reasons, which we address in turn.

**A.**

The dissent's primary concern is that the state appellate court applied "a bright-line rule that a suspect who has been told repeatedly that he is 'not under arrest' is not 'in custody' under *Miranda*." The dissent broadly states that all California courts apply this bright-line rule rather than the "totality-of-the-circumstances" test required by *Miranda* and its progeny.

We disagree with the dissent's characterization of the state appellate court's decision. While the court placed great weight on the fact that Smith was repeatedly told he was not under arrest, as the Supreme Court and we have done in similar cases, it did not impose a "bright-line rule." Nowhere in its decision does the state appellate court set out a legal standard that is contrary to the totality-of-circumstances test. Rather, it correctly recites the two-part custody test: "First, what were the circumstances surrounding the interrogation, and second, given those circumstances, would a reasonable person have felt he was not at liberty to terminate the interview and leave." *People v. Smith*, No. A125912, 2010 WL 4233298, at *2 (Cal. Ct. App. Oct. 27, 2010) (unpublished).

Nor does the state appellate court's application of the custody test belie a different standard. The state appellate court's decision set the stage of the interview and referenced the video footage. The court mentioned several factors that are indicative of custody, including how Smith was summoned and brought to the police station, the removal of Smith's backpack and phone, aspects of the interview's surroundings, the duration of the questioning, and some statements made during the interrogation. Other circumstances that were not mentioned by the state appellate

court may also weigh in favor of the view that Smith was in custody, but a court is not required to list each such circumstance in its unpublished decision. *See Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004) ("[S]tate courts are not required to address every jot and tittle of proof suggested to them, nor need they 'make detailed findings addressing all the evidence before [them].'") (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 347 (2003)). Similarly, the state appellate court was not required to marshal all countervailing circumstances in order to deem the interview non-custodial. The Supreme Court did not do so after mentioning numerous coercive circumstances in its brief *per curiam* decision reversing the California appellate court in *California v. Beheler*, 463 U.S. 1121 (1983).

If the state appellate court had created and applied a "bright-line rule" instead of employing the totality-of-circumstances test, it would have been unnecessary for the court to have addressed all of these circumstances suggesting custody. Moreover, the state appellate court did not uniformly dismiss these circumstances based on the so-called *Beheler* admonishments. For example, the court compared the length of the interview with the length of interviews previously found not to be custodial by the California Supreme Court. *Smith*, 2010 WL 4233298, at *3 ("While the interview was lengthy (about 3.5 hours to the point where appellant began making incriminating statements), it was similar in length to one where our Supreme Court found a defendant not to be in custody. (Cf. *People v. Leonard* (2007) 40 Cal. 4th 1370, 1400 [a defendant who was questioned for 3.5 hours was not in custody].)"). The state appellate court also addressed Smith's argument that his phone and backpack had been confiscated. The court found that it was "far from clear whether the police took [the]

backpack." *Smith*, 2010 WL 4233298, at *4. It concluded that the importance of this circumstance was "minor," because, "[i]n any event, . . . nothing . . . would have prevented [Smith] from simply asking that they be returned." *Id*. The state appellate court did not deem such coercive circumstances to be irrelevant in light of the *Beheler* admonishments. It found them "lessened by the fact that at three different points during that questioning, appellant was told that he was not under arrest." *Id.* at *3.

Thus, we disagree with the dissent's argument that the custody test employed by the state court was contrary to that required by clearly established law. The state appellate court invoked and then applied the totality-of-circumstances custody test. Indeed, the dissent's objection that the state appellate court viewed the *Beheler* admonishments as "virtually conclusive evidence" appears to concede that the court did not apply a "bright line rule."

Even if we were to agree with the dissent's characterization of the state appellate court's decision, which we do not, relief must be denied. There is no clearly established Supreme Court law that a *Beheler* admonishment is not due significant weight in the custody test. Rather, the Supreme Court and our court also "have consistently held that a defendant is not in custody when officers tell him that he is not under arrest and is free to leave at any time." *United States v. Bassignani*, 575 F.3d 879, 886 (9th Cir. 2009); *see also Howes*, 132 S. Ct. at 1185 ("Most important, [respondent] was told at the outset of the interrogation, and reminded thereafter, that he was free to leave . . . ."); *Beheler*, 463 U.S. at 1122; *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977); *United States v. Crawford*, 372 F.3d 1048, 1060 (9th Cir. 2004) (en banc) ("Perhaps most significant for resolving

the question of custody, Defendant was expressly told that he was not under arrest . . . ."); *Dyer v. Hornbeck*, 706 F.3d 1134, 1136–40 (9th Cir. 2013); *United States v. Norris*, 428 F.3d 907, 912 (9th Cir. 2005).

Indeed, it is common sense to give significant weight to the fact that a person was repeatedly told that he was not under arrest in evaluating whether a reasonable person in his circumstances would have thought himself to be under arrest. The dissent paints a picture of California police officers nefariously gaming the system by telling people that they are not under arrest. But there is no better way to communicate that a person is not under arrest than by telling him. As the panel explained in its memorandum disposition and Judge Watford elaborated in his concurrence, "[t]his is not to say that an interrogation begun with a so-called '*Beheler* advisement' cannot become custodial as that interrogation drags on and coercive circumstances accumulate." Rather, "on the facts presented, the state appellate court did not unreasonably conclude that the custodial rubicon had not been crossed by the time Smith first confessed, and thus the prophylactic procedural measures adopted by the Supreme Court in *Miranda* had not been triggered."

## B.

For the reasons stated in our memorandum disposition, we also disagree with the dissent's view that the state court unreasonably applied the custody test.

We add that other circumstances that were not mentioned by the state appellate court also weigh against the view that Smith was in custody. For example, Smith was never handcuffed. The door to the interview room was unlocked

and was at times left open, including during the time period after the lie detector test had been administered. Although Smith was brought from school to the police station by a uniformed officer, that officer was a "youth services officer" who was assigned to Vallejo High School, and thus her presence was likely neither extraordinary nor particularly intimidating. The interrogating detectives were dressed in plain clothes and were courteous and relaxed for the substantial majority of the interview. Smith left the interview room once during the pre-*Miranda* interview, albeit only for about 1 minute and 20 seconds. Smith was given three breaks during the pre-*Miranda* interview, during which he was left alone in the room for 40, 2, and 20 minutes. While left alone, Smith can be seen on the videotape practicing for the interview, which may be interpreted as evidence that Smith deliberately remained at the station in order to dispel suspicion of him. Smith signed forms consenting to the lie detector test and to the search of his room for the clothes he was wearing at the time of the incident. As the state appellate court noted, the California Supreme Court has "ruled that someone who had signed such a statement would understand that he was not in custody." *Smith*, 2010 WL 4233298, at *3 (citing *People v. Ochoa*, 19 Cal. 4th 353, 402 (1998)).

Additionally, after Detective Pucci administered the lie detector test, he shook Smith's hand and stated, "If I don't get a chance to see you again, good luck to you, and I hope everything works out for you, alright." He then handed Smith his card and stated "You got any questions, concerns about anything, that's my desk number there. Alright?" A reasonable person would view this interaction as an indication that Smith was free to leave. At the very least, the state court's determination that a reasonable person would feel free to leave was not objectively unreasonable.

Furthermore, we cannot agree with the dissent's statement of some facts. Most notably, we cannot conclude that the state appellate court was of the mistaken view that Smith was told three times that he was "free to go." We know that Smith's second advisement that he was not under arrest was accompanied by a statement that he was "free to go," but that his third advisement that he was not under arrest did not include such a statement. Although the record does not indicate exactly what Smith was told when he was approached at school, the state appellate court opined that Smith was told that "he was not under arrest and [was] asked whether he was willing to go to the police station to answer some questions." *Smith*, 2010 WL 4233298, at *1.[1] Regardless of how each advisement is characterized, this counting exercise is of no consequence, as the state appellate court was not objectively unreasonable in viewing the three advisements that Smith was "not under arrest" as having conveyed messages that Smith was free to go.

We also note that Smith and the dissent overstate how much several factors weigh in favor of the view that Smith's pre-warning confession was custodial. Although the pre-warning interrogation was long, we cannot conclude on AEDPA review that it was "a marathon session designed to force a confession." *Bassignani*, 575 F.3d at 886 (quotation marks omitted); *cf. Dyer*, 706 F.3d at 1136 (nearly four-hour nighttime interrogation). While Smith was brought to the police station in a police car, he joined the officer voluntarily and had a friendly conversation along the way. *See Beheler*,

---

[1] Indeed, the state appellate court's specific discussions of the first and third advisements demonstrate that, notwithstanding a prefatory sentence suggesting otherwise, the court was not under the impression that Smith was told he was free to go three times.

463 U.S. at 1122; *Mathiason*, 429 U.S. at 495 ("He came voluntarily to the police station . . . ."); *Crawford*, 372 F.3d at 1059 (emphasizing that the defendant "agreed to accompany" the officers). And while the accusatory nature of an interview is an important circumstance to consider, Smith's interrogation did not become custodial simply because the officers questioned Smith's veracity, confronted him with evidence of his guilt, and promised leniency. *See Mathiason*, 429 U.S. at 493 (officers told suspect that his fingerprints had been found at the scene and that "his truthfulness would possibly be considered by the district attorney or judge"); *Stansbury,* 511 U.S. at 325 (telling a person he is a "prime suspect" does not necessarily mean he is under arrest because "some suspects are free to come and go until the police decide to make an arrest").[2] Indeed, the detectives generally questioned Smith in a friendly, courteous tone, and their posture was relaxed. At one point, Smith can be seen laughing and joking with Detective Pucci about mutual acquaintances. The officers also permitted Smith to give narrative answers and "appealed to his interest in telling the truth and being helpful." *Alvarado*, 541 U.S. at 664. A fairminded jurist could view many statements that Smith labels as implicit threats and promises as explanations of the importance of truth and as explaining the differences between an intentional and a negligent act.

---

[2]    The Supreme Court has explained that "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question." *Mathiason*, 429 U.S. at 495.

We recognize that the state appellate court did not address Detective Pucci's comment that Smith could not "leave the room lying bro." But the comment appears to have been directed at Smith's claim that he changed the channel on the television to watch cartoons with the baby, which the detectives said was inaccurate.[3] A fairminded jurist could

---

[3] As explained by the district court, the exchange was as follows:

| | |
|---|---|
| D. MUSTARD: | You didn't change the station. |
| SMITH: | Huh? |
| D. MUSTARD: | You didn't change the station. |
| SMITH: | I did change the station. |
| D. MUSTARD: | You did not change the station. I just was at the house and do you know what channel the TV is on – BET. |
| SMITH: | She turned – I did turn the station. I had a remote. I turned it. |
| D. MUSTARD: | You didn't turn the station Javon'z. [*sic.*] |
| D. PUCCI: | Hey . . . |
| D. MUSTARD: | Don't lie man. |
| D. PUCCI: | . . . Just . . . |
| D. MUSTARD: | You can't leave this room lying bro. |
| D. PUCCI: | . . . What happened out there man? Just tell me did the baby do something? Was there some |

conclude that a reasonable person would not have interpreted this statement literally, particularly in the context of the previous advisements that Smith was not under arrest. Instead, the statement could fairly be viewed as an appeal to the importance of truth.

Additionally, we note that the state appellate court acknowledged that Detective Pucci's third advisement that Smith was not under arrest was less than clear. But the court concluded that to the extent that Detective Pucci's advisement was ambiguous in context, notwithstanding the previous advisement that Smith was free to go, a reasonable person would have asked for clarification. Smith did not ask for clarification and did not seek to leave after the lie detector test was administered. We cannot conclude that the state appellate court's view was objectively unreasonable.

We acknowledge that this is a close case. Perhaps there are other circumstances, beyond those mentioned by Smith, the dissent, and the state appellate court, that weigh in favor of the view that Smith was in custody. But on AEDPA review, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington*, 131 S. Ct. at 786. The list of decisions reversing us for ignoring this rule is long.[4] As the panel, district judge, and

---

circumstance behind this whole thing?

SMITH:            No.

[4] *See, e.g.*, *Davis v. Ayala*, 135 S. Ct. 2187, 2202 (2015) (faulting us for having "misunderstood the role of a federal court in a habeas case"); *Harrington*, 131 S. Ct. at 785 (reversing us and explaining that "even a strong case for relief does not mean the state court's contrary conclusion

magistrate all agreed, a fairminded jurist could hold, as did the three judges on the state court of appeal, that Smith was not in custody when he first confessed to killing the baby. That compels a denial of relief under AEDPA.

was unreasonable"); *Alvarado*, 541 U.S. at 665 (reversing us and explaining we were "nowhere close to the mark" in concluding that a state court unreasonably applied the custody test); *Lockyer*, 538 U.S. at 75 (reversing us for "fail[ing] to give proper deference to state courts by conflating error (even clear error) with unreasonableness").