Filed 7/12/18

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ANTONIO TORRES,<br><br>    Defendant and Appellant. | D072610<br><br><br><br>(Super. Ct. No. SCN362581) |

APPEAL from a judgment of the Superior Court of San Diego County, K. Michael Kirkman, Judge.  Reversed.

Arielle Bases, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Felicity Senoski and Joseph Anagnos, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Antonio Torres of two counts of committing a lewd act with a minor under 14 years old (Pen. Code, § 288, subd. (a)) and found true the allegations that he had substantial sexual conduct with the minor.  (Pen. Code, § 1203.066, subd. (a)(8).)

The court sentenced him to a total term of eight years and ordered him to pay various fines and fees, including victim restitution in the amount of $5,925.75.

Appointed appellate counsel has filed a brief summarizing the facts and proceedings below. She presented no argument for reversal, but asked this court to review the record for error as mandated by *People v. Wende* (1979) 25 Cal.3d 436 (*Wende*). Under *Anders v. California* (1967) 386 U.S. 738, she listed as possible, but not arguable, issues whether: (1) defense counsel was ineffective for failing to raise *Miranda*[1] and voluntariness of confession issues, (2) sufficient evidence supported the lewd conduct and substantial sexual conduct findings, (3) the trial court erred by admitting a forensic interview into evidence, (4) the court erred when it gave the jury a pinpoint instruction defining masturbation, (5) the court erred by imposing the middle term sentence rather than the lower term sentence, and (6) the court erred by imposing consecutive sentences.

We requested supplemental briefing to address whether defense counsel was ineffective for failing to file a motion to suppress Torres's police interview statements under *Miranda*. Both counsel responded to our request. We conclude that while the interrogation was not custodial when it began, the totality of the circumstances show that it became custodial, and Torres should have received *Miranda* warnings when the detectives essentially told Torres that they would not leave, and he could not go home, until Torres told them the truth based on the evidence they had against him.

---

[1]     *Miranda v. Arizona* (1966) 384 U.S. 436.

We also conclude that Torres would have prevailed on a suppression motion, that the failure to file a suppression motion was prejudicial. We reverse the judgment based on ineffective assistance of counsel. Accordingly, it is unnecessary for us to consider the other issues raised in Torres's *Wende* brief.

## FACTUAL AND PROCEDURAL BACKGROUND

*The Allegation and Preliminary Investigation*

In February 2017 73-year old Torres, a Mexican immigrant with no formal education, rented a room from O.H. (Mother) and her husband (Father). The couple's five-year-old daughter, Y.C., also lived at the residence. The couple and Y.C. referred to Torres as "Don Tonio." Torres spent most of his time in his room, but would occasionally watch television in the living room with Y.C.

One day after Mother had given Y.C. a bath, she told Mother that she wanted to tell her something and then said " 'I don't know why Don Tonio always touches my little butt.' " After initially denying that she and Y.C. had a name for Y.C.'s private parts, when the prosecutor used the term "colita," Mother stated that the term referred to Y.C.'s "buttocks" and "private parts," including her vagina. When Mother asked Y.C. exactly what Torres had done, Y.C. stated that "he always touched her colita and showed her that long thing" and that Y.C. pointed at Y.C.'s vagina. Y.C. also relayed that Torres had told Y.C. to not tell Mother. Father confronted Torres who denied the allegation. Father called the police and Torres moved out.

Two days later, San Diego Sheriff's Detective David Brannan followed up on the report and arranged for Y.C. to receive a forensic medical examination that day and a

forensic interview about a week later. The forensic examination revealed no physical findings. The doctor explained that no physical findings could still be consistent with fingers in the genitalia based on multiple factors, including a child's immature concept of penetration, the use of a lubricant, or tissue healing.

During the forensic interview, the interviewer established that Y.C. knew the difference between the truth and a lie and that Y.C. had promised to tell the truth. Y.C. stated she was there because Don Tonio, who used to live at her house, had touched her "cola" with his hand more than once. The touching always occurred when Y.C. was in the living room. Y.C. stated that she was wearing a nightgown and that Torres touched her over her panties. She then stated that Torres had touched the inside of her cola, that he "always was touching [her] cola," and that he told her to not tell Mother.

*The Police Interview*

About two weeks later, Detective Brannan and Detective Cabrera, who spoke Spanish, visited Torres where he was currently living. Detective Brannan asked Torres questions in English, Detective Cabrera translated the questions into Spanish for Torres and then translated Torres's responses into English for Detective Brannan. Torres agreed to speak to them after the detectives told him that he was not under arrest, was free to leave, and did not need to speak to them. They then explained that, for privacy, they wanted to talk to him in their parked car.

The vehicle was unmarked, both detectives wore plain clothes and no weapons were visible. Detective Brannan sat in the driver's seat, Torres in the front passenger

4

seat, and Detective Cabrera sat in the rear seat behind Torres. The car doors were closed and the engine was running to power the air conditioning.

Torres believed that the detectives were there to talk to him because he had urinated in the yard. After Torres explained this, the detectives asked Torres to provide a saliva sample for testing. Torres agreed. The detectives explained that DNA could be used to test if a person touched another person, that Torres's DNA was being tested in the car's trunk against other evidence, and that they would know the results in a couple of minutes. When asked why he thought the detectives were conducting a DNA test, Torres stated "No, to know if—if I touched the little girl or what?" When asked what the little girl said, Torres replied that the girl told her mom that he had grabbed the girl in her private part, meaning her vagina, but that the allegation was not true. When asked how many times he touched the girl's vagina, Torres stated, "No, not never," and "No. No. No. She's a little girl (unintelligible) of four years."

When Torres expressed the belief that the girl and Mother had seen his penis when he was outside urinating, the detectives explained to Torres that a child psychologist spoke with the girl and she never claimed that she saw his penis. When the detectives explained that the girl claimed that Torres had touched her vagina with his hand, Torres responded:

> "Uh, no. Why? I grabbed her. She was in shorts and small skirt. I
> grabbed her but how was I, uh, if—if I got her in my arm like this,
> because I saw that she got frightened when—when I turned and
> since I—I wasn't there, she got frightened and thought—she
> probably thought it was another person. And she turned and [I said]
> 'it's me' (unintelligible)."

5

Detective Brannan then had Torres touch Brannan's shirt and told Torres that Torres's DNA was now on the shirt. The detectives told Torres that a doctor examined the girl's vagina and found DNA that belonged to an adult male and that they were currently testing Torres's DNA against the DNA found on the girl's vagina. When asked what he thought the results would be, Torres stated "Well, I believe that nothing is— nothing is gonna come out, I say, so—"

The detectives explained that they would write a report to the judge regarding the results of the investigation and would need to explain why Torres's DNA was together with the girl's DNA. They told Torres that they knew he had not put his penis in her vagina, put his mouth on her vagina, put her mouth on his penis, put his penis in her anus, put his mouth on her anus, or put his fingers in her anus, but they claimed that they would be able to prove that Torres had touched the girl's vagina with his hand.

The detectives then asked Torres if he wanted the judge to think he was an honest man who made a mistake or "an animal." Torres responded, "No, well, I don't know how—" The detective asked, "So, please tell me that you're an honest man who just made a mistake because the only other alternative is that people are gonna think you're an animal." The detectives told Torres to have the courage to admit his mistake and, although they knew Torres did not want to say what happened, that they already knew what happened and could prove it scientifically.

The detectives again told Torres that the conduct was "minimal" and it was not like he had put his penis in the girl's vagina. They stated, "So, you have to, like I told you have courage to admit your mistake. I made a mistake. This is what I did." They

6

explained that they could prove what happened because the scientific test was being conducted in the trunk of the police car, but the judge would want to hear Torres's own words about what happened. Torres stated, "Like I tell you chance over her shorts I may have put and—and (unintelligible) and there—there it'd come out with that, right?" When asked to explain again, Torres stated, "I may have put fingers upon grabbing her over her shorts because—" Torres explained that he put his hand on the girl's shorts when he grabbed her to give her a hug.

The detectives told him that the problem with this story was that the DNA was found inside the girl's shorts, that it was important for Torres to be honest, and that Torres should not say something that they know did not happen. They explained to Torres that they had evidence to prove what Torres said did not happen and that when their report was submitted to the judge, the judge would think that Torres believed that the judge was stupid. Torres then explained that he might have put his hands inside the girl's shorts when he went to grab the girl because her shorts were wide.

When the detectives told Torres that Torres had tried to make the girl feel good, to excite her, Torres responded, "Ah, no, I don't—I don't," and "Well, I didn't——I didn't think any of that." The detectives then told Torres that they had given the girl a lie detector test and what the girl said was true. They explained that if the girl was not lying then Torres was not telling the truth.

The detectives told Torres that he was not in that much trouble and they were not there to arrest him. They claimed that they were there to get the truth, that they would then leave and write a report to the judge who was very smart and would know when a

7

person is lying. After telling Torres that as soon as he told the truth they would leave, Torres stated, "Yes, it's the truth is that I put the hand like this. Well, over the—the—the, the but like I tell you it wasn't on purpose. That I might've put the hand in over the shorts. Because I—I grab like this, 'Don't get frightened (unintelligible).' And then the lady came out and she got mad. I told her, 'Ma'am I couldn't hold the need to urinate.' And—."

After explaining to Torres that the exam showed it was not just one time, but many times, Torres responded "Aw. No." They told Torres to be brave and say that he made a mistake and would not do it again. Torres responded, "I made a mistake. Yes." When asked what mistake he made, Torres responded, "It's the mistake of putting the fingers." When asked how many times he did it, Torres responded, "Well, no, just. It seems to me two times." The detectives congratulated Torres for telling the truth and stated they were making progress.

They asked Torres for the details of the two times so that they could explain it to the judge. They told Torres that he would feel good by telling the truth, and everyone would agree that men who take responsibility for their mistakes are true men. When asked how it happened the first time, Torres stated the girl sat on him in the living room while watching television and that when he grabbed the girl his hand went through the girl's shorts and under her underwear. When asked where he put his fingers, Torres responded "just on top" and that the girl then took his hand off. When asked what part of the vagina he touched, he stated the "outside." Torres denied massaging the girl and stated it was in passing, that the girl took his hand away, then got up and left.

8

When again asked if he massaged her a little bit, Torres responded, "Just a passing like this." When asked what he was thinking when he touched the girl, Torres responded "Well, stupidity, well, I believe." The detectives asked Torres if when he touched the girl that he also checked that she liked it. After Torres denied that, they told Torres that he touched the girl either because he liked it or he was trying to make the girl feel good— "So, which is it?" Torres responded, "Well, I think because I liked it, because why was I going to think that she was going to like it. If she doesn't have any—she's small."

Torres then stated the second time happened in passing. The detectives told him that he was doing a really good job and was starting to be honest, but they all knew it happened more than two times, because the girl said it happened more than two times. Torres responded, "No." The detectives then told Torres that he was lying and asked why he was starting to lie now. Torres stated, "No. I'm telling the truth. It was two times—"

The detectives again asked whether he did it because he liked it or the girl liked it. Torres responded, "Of course. Yes, because why would I think that she liked it." One of the detectives drew a picture of a vagina and had him mark with an "x" where he touched the girl. Torres confirmed that there was skin-to-skin contact under the girl's underwear. Torres stated that he had never done this to any other children and he made a mistake that he regrets.

The detectives asked Torres whether after the incidents he told the girl anything about the girl's mother. Torres responded "No, I didn't tell her anything . . . [a]h, no, well, I didn't tell her anything. That's the truth." The detectives then asked whether he had told the girl to not tell her mother. Torres confirmed that he told the girl this both

9

times.  Detective Brannan gave Torres his business card, told Torres that he would be writing a report to the judge and maybe the judge would not do anything because Torres was honest.  Police arrested Torres two weeks later.

*The Trial*

During in limine proceedings, the prosecution proffered Torres's statements to the detectives under Evidence Code section 1220.  After a discussion took place off the record, the trial court indicated that, assuming the appropriate foundation and no objection, it would allow Torres's interview statements to be introduced through the detectives' audio recording.  Defense counsel did not object or request a *Miranda* hearing. Defense counsel also did not object when the prosecution requested to play the audio recording for the jury.

DISCUSSION

I.  *ALLEGED* MIRANDA *VIOLATION*

A.  *Ineffective Assistance–Applicable Law*

"The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect."  (*Kimmelman v. Morrison* (1986) 477 U.S. 365, 374 (*Kimmelman*).)  To establish a claim of ineffective assistance of counsel the defendant must prove both counsel's representation was objectively deficient—below a reasonable standard of care under prevailing professional norms—and prejudice flowing from the deficient performance; that is, but for counsel's errors, the defendant

10

would have received a more favorable result.  (*People v. Waidla* (2000) 22 Cal.4th 690, 718.)

It is the defendant's burden on appeal to show by a preponderance of the evidence that he or she was denied effective assistance of counsel and is entitled to relief.  (*People v. Ledesma* (1987) 43 Cal.3d 171, 218.)  "On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding."  (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

Where a claim of ineffective assistance is premised on a failure to seek suppression of evidence obtained in violation of the Constitution, the defendant must demonstrate the suppression motion was meritorious and there is a reasonable probability the verdict would have been different had defendant prevailed on the motion. (*Kimmelman*, *supra*, 477 U.S. at p. 375.)  "In determining prejudice, we inquire whether there is a reasonable probability that, but for counsel's deficiencies, the result would have been more favorable to the defendant." (*People v. Frye* (1998) 18 Cal.4th 894, 979, overruled on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*People v. Williams* (1997) 16 Cal.4th 153, 215.)

11

B. *Custodial Interrogations–Applicable Law*

*Miranda* requires that a person questioned by police after being "taken into custody or otherwise deprived of his freedom of action in any significant way [must first] be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." (*Miranda*, *supra*, 384 U.S. at p. 444.) "By its very nature, custodial police interrogation entails 'inherently compelling pressures.' [Citation.] Even for an adult, the physical and psychological isolation of custodial interrogation can 'undermine the individual's will to resist and . . . compel him to speak where he would not otherwise do so freely.' [Citation.] Indeed, the pressure of custodial interrogation is so immense that it 'can induce a frighteningly high percentage of people to confess to crimes they never committed.' " (*J.D.B. v. North Carolina* (2011) 564 U.S. 261, 269.)

Under *Miranda*, custody is a term of art meant to designate circumstances "that are thought generally to present a serious danger of coercion." (*Howes v. Fields* (2012) 565 U.S. 499, 508-509.) Because a *Miranda* warning is only required once custodial interrogation begins, the defendant must necessarily have been in custody in order to assert a *Miranda* violation. Whether a person is in custody "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." (*Stansbury v. California* (1994) 511 U.S. 318, 323 (per curiam).) When there has been no formal arrest, the custody issue revolves on how a reasonable person in the suspect's position would have understood his or her situation. (*People v. Moore* (2011) 51 Cal.4th 386, 394-395.)

To determine whether an interrogation is custodial we consider a number of circumstances, including: "whether contact with law enforcement was initiated by the police or the person interrogated, and if by the police, whether the person voluntarily agreed to an interview; whether the express purpose of the interview was to question the person as a witness or a suspect; where the interview took place; whether police informed the person that he or she was under arrest or in custody; whether they informed the person that he or she was free to terminate the interview and leave at any time and/or whether the person's conduct indicated an awareness of such freedom; whether there were restrictions on the person's freedom of movement during the interview; how long the interrogation lasted; how many police officers participated; whether they dominated and controlled the course of the interrogation; whether they manifested a belief that the person was culpable and they had evidence to prove it; whether the police were aggressive, confrontational, and/or accusatory; whether the police used interrogation techniques to pressure the suspect; and whether the person was arrested at the end of the interrogation." (*People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1162 (*Aguilera*).)

We independently evaluate whether the defendant was in custody by considering the totality of the circumstances surrounding the incident. (*People v. Pilster* (2006) 138 Cal.App.4th 1395, 1403.) No single factor is dispositive. (*Ibid.*) "Rather, we look at the interplay and combined effect of all the circumstances to determine whether on balance they created a coercive atmosphere such that a reasonable person would have experienced a restraint tantamount to an arrest." (*Aguilera*, *supra*, 51 Cal.App.4th at p. 1162.) Where, as here, an interview is recorded, the facts surrounding the admission are

13

undisputed and subject to our independent review. (*People v. Duff* (2014) 58 Cal.4th 527, 551.)

C. *Analysis*

The interview was an interrogation as it consisted of "words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." (*Rhode Island v. Innis* (1980) 446 U.S. 291, 301, fns. omitted.) Accordingly, our analysis turns on whether the interrogation was custodial. Torres argues there is no tactical reason for defense counsel to have not filed a motion to suppress. We agree that there is no tactical reason for failing to request a hearing, outside the jury's presence, to litigate the issue whether the interrogation was custodial. (*People v. Mai*, *supra*, 57 Cal.4th at p. 1009.)

We classify the circumstances of Torres's interview as against a custodial finding or in favor of a custodial finding. Examination of these factors lead us to conclude that Torres was in custody as a reasonable person would not have believed he or she could have terminated the interrogation and left. Accordingly, defense counsel's failure to file a motion to suppress amounted to prejudicial ineffective assistance of counsel.

1. Factors weighing against custodial finding

The detectives initiated contact with Torres at his home and Torres voluntarily agreed to an interview. Both detectives wore plain clothes and their weapons were not visible. The interview lasted 45 minutes, including the time when the detectives first made contact with Torres. The detectives never threatened Torres or raised their voices.

14

The entire interview took place in a "matter of fact" conversational tone. Torres was not arrested until two weeks after the interview.[2]

When the detectives first contacted Torres they informed him that he was not under arrest, was free to leave, and was not required to speak to them. Such advisements are sometimes known as " '*Beheler* admonishments,' " after the United States Supreme Court decision in *California v. Beheler* (1983) 463 U.S. 1121 (*Beheler*). (*Smith v. Clark* (9th Cir. 2015) 804 F.3d 983, 986 (*Smith*).) As the *Smith* court noted, "police officers in California are specifically instructed to inform suspects that they are 'not under arrest' in order to 'ma[k]e certain that the interrogation w[ill] be seen as non-custodial' [and that] California police academies have interpreted *Beheler* to mean that, if a police officer says the magic words, telling a suspect that he is 'not under arrest,' the suspect will not be found to have been in 'custody' under *Miranda*." (*Smith*, at p. 986.)

The *Smith* court concluded that "the California courts—and the California police academies—have misread *Beheler*. They interpret it as creating a bright-line rule that a suspect who has been told repeatedly that he is 'not under arrest' is not 'in custody' under *Miranda*. But *Beheler* does not stand for such a rule, nor could it. It has never been the law that a police officer can insulate an otherwise clearly custodial interrogation from

---

2    Torres's criminal history consists of three convictions for possession of controlled substances. Torres's criminal history and past experience with law enforcement, however, are not relevant to the question whether Torres was in custody, which is an objective inquiry. (*Stansbury v. California*, *supra*, 511 U.S. at p. 323; *Yarborough v. Alvarado* (2004) 541 U.S. 652, 667-668 [subjective criteria are not relevant to the custody analysis].)

*Miranda*'s reach simply by telling a suspect that he or she is 'not under arrest.' " (*Smith*, *supra*, 804 F.3d at p. 988.)

We agree that *Beheler* does not stand for the proposition that simple advisements, standing alone, insulate an interrogation from *Miranda*'s reach. *Beheler*, a short per curiam opinion, addressed "whether *Miranda* warnings are required if the suspect is not placed under arrest, voluntarily comes to the police station, and is allowed to leave unhindered by police after a brief interview." (*Beheler*, *supra*, 463 U.S. at p. 1121.) While the opinion noted that police told the defendant that he was not under arrest when he agreed to accompany them to the police station (*id.* at p. 1122), a complete reading of *Beheler* shows that the *Beheler* court did not rest its decision on this fact. Rather, the *Beheler* court noted that the " 'totality of circumstances' " on which the California appellate court focused its attention consisted of the facts that defendant was a suspect and the questioning took place in a station house. (*Id.* at p. 1125.)

We do not agree, however, with the *Smith* court's conclusion that California courts have misread *Beheler*. (*Smith*, *supra*, 804 F.3d at p. 988.) Rather our review of published California state court cases citing *Beheler* reveals that these courts looked at the totality of the circumstances and did not rely exclusively on what law enforcement told the defendant before questioning began. (See, e.g., *People v. Bejasa* (2012) 205 Cal.App.4th 26, 35; *People v. Macklem* (2007) 149 Cal.App.4th 674, 695; *In re Kenneth S.* (2005) 133 Cal.App.4th 54, 64; *Aguilera*, *supra*, 51 Cal.App.4th at p. 1162.)

In *People v. Saldana* (2018) 19 Cal.App.5th 432 (*Saldana*) we recently concluded that *Miranda* warnings were required during a police station interrogation regarding

16

alleged sexual molestation because, under the totality of the circumstances, the detective created such a coercive environment that no reasonable person in the defendant's position would have thought he or she could walk out of the interrogation room. (*Id.* at pp. 440-441, 463.) The defendant voluntarily agreed to be questioned, was not handcuffed, was questioned by only one detective, and was told that he was not under arrest and was free to leave. (*Id.* at pp. 456-457, 459.) The *Saldana* court noted that "'[t]he mere recitation of the statement that the suspect is free to leave or terminate the interview . . . does not render an interrogation non-custodial per se.' [Citation.] "We must consider the delivery of these statements within the context of the scene as a whole.' [Citation.] This is because the *Miranda* test for custody 'does not ask whether the suspect was told that he was free to leave; the test asks whether "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." ' " (*Id.* at pp. 457-458.)

In *Saldana*, the sole purpose of the interview was to obtain a confession, the detective used persistent, confrontational, and accusatory interrogation techniques, insisted that defendant was guilty, disbelieved defendant's many denials and suggested to defendant that he would "in some way feel better or benefit if he confesse[d], such as appealing to less morally culpable reasons for committing the offense." (*Saldana*, *supra*, 19 Cal.App.5th at p. 460.) This created a police-dominated atmosphere with the *Saldana* court finding that the detective "conveyed the message that [defendant] had no meaningful choice but to admit to some version of the crime because continued denials— in light of the extensive and irrefutable evidence against him—was simply futile. Insisting on the 'truth' until [defendant] told [the detective] what he sought, the objective

17

message conveyed was that [defendant] would be interrogated until he admitted touching the girls." (*Ibid.*)

As the next portion of the analysis shows, the historical facts in the instant case weighing in favor of a custodial finding are similar to those presented in *Saldana*.

2. Factors weighing for custodial finding

The detectives interviewed Torres as a suspect after receiving a complaint that he had possibly molested a child, and after the child underwent a forensic medical examination and forensic interview. The police interview took place in an unmarked car, a location controlled by the detectives, with the doors closed and the engine running to power the air conditioner. As noted in *Miranda*, being alone with the person under interrogation is "the 'principal psychological factor contributing to a successful interrogation.' " (*Miranda*, *supra*, 384 U.S. at p. 449.)

Questions where the detectives did not suggest an answer occurred at the beginning of the interview when the detectives asked Torres if he knew why they were there to talk to him. Torres expressed the belief that the detectives were there because he had urinated in the yard of the family where he lived. The detectives then obtained background information about where this occurred, what family he was referring to, and who had seen him. Immediately thereafter, the detectives obtained Torres's permission to get a saliva sample. The detectives explained that they would be running a DNA test in the trunk of the car to determine if Torres had touched another person and would have the results in a "few minutes."

18

The detectives then asked Torres if he knew why they were testing his DNA, with Torres responding that the girl's mother had falsely accused him of grabbing the girl's "part." Torres responded affirmatively when asked, "[W]hen you say private parts you say it's the—the vagina, right?" When asked how many times he had touched the girl, Torres answered, "No, not, never." When asked again if it happened, Torres responded, "No. No. No. She's a little girl (unintelligible) of four years."

From this point on, the detectives dominated and controlled the course of the interrogation and used interrogation techniques to pressure Torres, including telling Torres about false evidence, asking confrontational and accusatory leading questions, giving Torres choices and encouraging him to pick one of those choices, and minimizing the accusations against him. The detectives also expressed their belief that Torres was culpable and they had evidence to prove it. These factors all weigh in favor of a determination that Torres was in custody. (*Aguilera*, *supra*, 51 Cal.App.4th at p. 1162.)

The detectives informed Torres that Y.C. had spoken to a child psychologist and did not claim to have seen or touched Torres's penis. They claimed that Y.C. told them that Torres had used his fingers to touch her vagina. Torres denied the accusation, stating that he had put his arms around the Y.C. from behind and that she had gotten frightened. The detectives then told Torres that DNA could be transferred by a touch, such as touching a shirt. The detectives falsely explained that male DNA was found on Y.C. and that they were testing evidence in the trunk of the car to prove Torres's culpability.

The detectives told Torres that he would need to explain to a judge why Torres's DNA was found on the girl's underwear. The detectives then used an interrogation

19

technique referred to as "minimization" where the " 'tactics are designed to provide the suspect with moral justification and face-saving excuses for having committed the crime in question,' a tactic that 'communicates by implication that leniency in punishment is forthcoming upon confession.' " (*In re Elias V.* (2015) 237 Cal.App.4th 568, 583.)

The detectives "minimized" by telling Torres that they knew he had not put his penis in her vagina, put his mouth on her vagina, put her mouth on his penis, put his penis in her anus, put his mouth on her anus, or put his fingers in her anus, but they claimed that they would be able to prove that Torres had touched the girl's vagina with his hand and that they needed to explain to a judge why Torres's DNA was found with Y.C.'s DNA. They then posed Torres with a dilemma, asking him whether he wanted the judge to think he was an honest man who made a mistake or an animal, while explaining to Torres they could prove that Torres had touched Y.C.'s vagina with his hand. They again used minimalization, explaining that everyone makes mistakes and that Torres needed to tell the judge that he was "an honest man [who] . . . just made a mistake," that "the other alternative is going to be . . . they're going to think you're an animal" and that Torres needed the courage to admit a mistake they would be able to prove scientifically.

When Torres explained that he touched Y.C. with his fingers when he hugged her, the detectives falsely told him that DNA was found inside the girl's shorts and again placed Torres in a dilemma that they knew he was lying, could prove it to a judge and the judge would think that Torres believed that the judge was stupid. Torres then explained that he might have put his hands inside the girl's shorts when he went to grab the girl because her shorts were wide. At this point the detectives falsely told Torres that Y.C.

20

had taken a lie detector test, that she was not lying, and thus Torres was not telling the truth. The detectives again used minimization telling Torres that he was not in that much trouble, they were not there to arrest him, that they wanted the truth and that the judge was a smart man who would know that Torres was lying. "Studies demonstrate that the use of false evidence enhances the risk of false confessions." (*In re Elias V.*, *supra*, 237 Cal.App.4th at p. 584.)

The detectives used a classic two-sided interrogation process relying "on negative incentives (i.e., tactics that suggest the suspect should confess because no other course of action is plausible, such as confronting suspects with real or invented evidence, identifying contradictions in the suspect's account, and refusing to credit his denials or alibi) and positive incentives (i.e., tactics that suggest the suspect will in some way feel better or benefit if he confesses, such as appealing to the suspect's self-interest or minimizing the seriousness of the offense)." (Drizin & Leo, The Problem of False Confessions in the Post-DNA World (2004) 82 N.C. L.Rev. 891, 912.) These interrogation techniques placed Torres in a hopeless position—the police had evidence that Y.C. was not lying, that he had touched Y.C.'s vagina and he needed to have the courage to admit his mistake or the judge would think he was a liar and an animal.

The detectives then told Torres they would not arrest him that day, but that the judge would know Torres was lying. Specifically, before Torres confessed Detective Cabrera told Torres in Spanish:

> "Cabrera: —We're not here to arrest you. [A]s soon as we're done talking you go and we're gonna go too.
>
> "[Torres]: Yes.
>
> "Cabrera: We're here to know the truth based on the evidence that we got—
>
> "[Torres]: Uh-huh.
>
> "Cabrera: —And write a report for the judge.
>
> "[Torres]: Yeah.
>
> "Cabrera: But the judge is a very smart man— (Unintelligible)
>
> "[Torres]: Yes. Of course.
>
> "Cabrera: And he knows when he's being lied to. You know that too.
>
> "[Torres]: Yes. Of course.
>
> "Cabrera: Okay[.] He says that— Now that— He says that[] its very simple, that the only thing he wants is for you to tell him the truth from— from the, to tell him the truth.
>
> "[Torres]: Uh-huh.
>
> "Cabrera: And as soon as you tell us the truth we go, (unintelligible) to your house.
>
> "[Torres]: Yes."[3]

---

[3] The original transcript of the detectives' interview of Torres includes Detective Brannon's questions in English followed by Detective Cabrera's translation. For ease of reading, we omit Detective Brannon's original questions.

In *Saldana* we noted that "in light of the detective's repeated rejection of Saldana's denials, a reasonable person in Saldana's position eventually would have realized that telling the 'truth' meant admitting the detective's information was correct—and that until this 'truth' came out, the person could not leave." (*Saldana*, *supra*, 19 Cal.App.5th at p. 458.) Here, the detectives went further than the detective in *Saldana*, essentially telling Torres they would not leave, and Torres could not return home, until Torres stopped lying and confessed to what the detectives could prove scientifically with the DNA test running in the trunk. The detectives' statements to Torres, when examined with the nature of the interrogation and the totality of the circumstances, created a custodial situation. A reasonable person in Torres's position—believing that a DNA test was running in the trunk and essentially being told he could not leave until he told the detectives what they claimed they could already prove—would not have felt at liberty to terminate the interrogation, open the car door, and leave. (*Howes v. Fields*, *supra*, 565 U.S. at p. 509.) While the detectives "maintained a professional demeanor [throughout the interrogation], a pleasant and conversational tone of voice does not permit the type of coercive police practices that are impermissible in the absence of *Miranda* warnings." (*State v. Mattheisen* (Or.Ct.App. 2015) 273 Or.App. 641, 651-652 [359 P.2d 1218, 1224]; *Saldana, supra,* 19 Cal.App.5th at p. 460.) Rather, a professional and calm demeanor is a police technique to keep a suspect there, answering questions.

After this point in the interview, when again pressed to tell the truth, Torres reverted to his initial claims that he might have put his hand over the girl's shorts, that it was a one-time event when he tried to hug the girl, the girl got frightened, and Mother got

mad at him for urinating in the yard. The detectives rejected Torres's claim that he had touched the girl one time, telling him that the exam showed it was "many times," with Torres responding, "Aw, no." The detectives reassured Torres that Torres was an honest man who had simply made a mistake. After Torres adopted the detectives' suggestion that he had made a mistake, and after being reassured that a man who accepts his mistakes can still be respected, Torres confessed to touching the girl twice while she sat on his lap watching television.

During this time Torres adopted the suggestion that he had put his hands inside the girl's shorts—something the detectives told him DNA had proved earlier in the interview. They also suggested that Torres had touched the girl under her underwear. "One of the ways police facilitate false confessions is by disclosing specific facts regarding the crime during the interrogation process, inducing the suspect to adopt these facts and thus accurately 'confirm[ ] the preconceived story the police seek to have him describe.' " (*In re Elias V.*, *supra*, 237 Cal.App.4th at p. 592.) Thereafter, the detectives led Torres through his confession with leading questions and choices: "[D]id you put your fingers[] inside?" "[W]hat part of the vagina did you touch, the inside or the outside?" "[Did] you massage[] it or what?" "On the outside . . . did [you] massage?" "[D]id [you] massage her just a little bit?" "[W]hat did you say to her about [her] mother?" [Y]ou touched her because you liked it or because you thought she was going to like it, which . . . was it? The contact "was skin to skin, right?" "You told [the] little girl not to tell her mom what happened." You told her "to not tell her mother or she was . . . going to be in trouble."

In *Saldana*, *supra*, 19 Cal.App.5th 432, the detective accused defendant of not telling the truth, repeatedly accused him of lying, and provided face-saving excuses for having committed the crimes. (*Id.* at p. 437.) The detectives acted similarly here while also using false evidence to override Torres's denials, informing Torres that they would not leave until they got the "truth," and then suggesting details of the alleged crimes for Torres to adopt. In *Saldana*, as here, where there has been no formal arrest the question whether a custodial interrogation took place presents an intensely factual inquiry into the totality of the circumstances. Thus, every situation is unique.

Weighing the totality of the circumstances here, we conclude that a reasonable person would not have felt at liberty to terminate the interrogation and leave, and that a custodial interrogation occurred without the administration of *Miranda* warnings. Accordingly, Torres has shown that defense counsel's representation fell below an objective standard of reasonableness by failing to file a meritorious motion to suppress the police interview on the ground he did not receive *Miranda* warnings. Based on this conclusion, we need not address whether Torres received ineffective assistance based on counsel's failure to seek suppression of the police interview on the ground Torres's statements were not voluntarily made.

4. Prejudice

We conclude that defense counsel's failure to file a suppression motion was prejudicial as there is a reasonable probability the verdict would have been different had Torres prevailed on the motion. (*Kimmelman*, *supra*, 477 U.S. at p. 375.)

25

There were no witnesses to the alleged molestation and no physical evidence showed that a molestation had occurred.  During the forensic interview, Y.C. claimed that Torres touched her many times  Y.C. could not identify Torres at trial.  During cross-examination, Y.C. admitted that she did not know the difference between the truth and a lie.  Y.C. claimed that she did not have a name for her private parts and that she did not know the words "cola" or "colita."  Mother also denied that she and Y.C. had a name for Y.C.'s private parts, until the prosecutor used the term "colita," which Mother then claimed referred to Y.C.'s "buttocks" and "private parts," including her vagina.  During cross-examination Y.C. agreed that Torres had touched her private parts too many times to count.  Y.C. also stated during cross-examination that Mother had told her to say that Torres had touched her cola:

> "Q  When you came in and talked to this other judge, isn't it true that
> you were asked:  Did somebody tell you to come here and say that
> Don Tonio touched your cola?  And you answered: Yeah.
>
> "A  Yes.
>
> "Q  And were you asked:  Who told you to say that?  And you said:
> My mom and dad.  [¶] Right?
>
> "A  No.  Just my mom.
>
> "Q  Your mom told you to come into court and say that Don Tony
> [*sic*] touched your cola?
>
> "A  Um, yeah.
>
> "Q  And when you were in front of that other judge, do you
> remember if you promised to tell the truth?
>
> "A  Yes.

"Q  Now, you promised to tell the truth but you don't know what the truth is; right?

"A  No.

"Q  What about today?  Are you telling the truth?

"A  Yes.

"Q  But do you know what the truth is?

"A  No.

"Q  When you came in the court on December 1st, 2016, and you talked to the other judge, you were asked:  Your mom and dad told you to come say that Don Tonio touched your cola?  And you said: Yeah.  [¶] Correct?

"A  Yes.

"Q  You're saying that because that's what your mommy and daddy have told you to say?

"A  Yes.  Yes."

Torres's statements during the police interview likely resolved any doubts jurors had regarding Y.C.'s credibility.  The police interview also corroborated Y.C.'s claim that the touching occurring in the living room and that Torres had told her to not tell Mother about the touching.

On this record, Torres's statements to the police were crucial to the prosecution. (*People v. Cahill* (1993) 5 Cal.4th 478, 497 [describing a confession " 'as a kind of evidentiary bombshell which shatters the defense' "].)  Had defense counsel moved to exclude them under *Miranda* there is "a reasonable chance and not merely an abstract possibility" that the trial court would have excluded them.  (*Richardson v. Superior Court*

27

(2008) 43 Cal.4th 1040, 1051.) There is also a reasonable probability that the outcome of the trial would have been more favorable to Torres if his statements to police had been excluded. Stated differently, defense counsel's deficient performance undermines our confidence in the outcome of this case. (*People v. Williams*, *supra*, 16 Cal.4th at p. 215.) Accordingly, the judgment must be reversed.

## DISPOSITION

The judgment is reversed.


NARES, J.

WE CONCUR:


McCONNELL, P. J.


O'ROURKE, J.